Nairetal v. Synapse Group Mr. Greifer? I would also request, though, to reserve five minutes. Yes, sir. The primary issue in this putative class action seeking B-2 certification is, what is the manner and degree of cohesiveness that plaintiffs need to demonstrate in order to certify a case? We contend that the lower court has used a standard improper as a matter of law and impossible to meet in any event. Because of the binding nature of the B-2 rule for B-2 certification, the courts require a level of cohesiveness between the parties. Can we start with standing, Mr. Greifer? Can we start with standing to start with here? Let's take a step back and address whether there's any basis for people who I think it's admitted are not synapse customers trying to disengage to argue about what's, to make complaints about what's being complained about. Well, actually, no. All of the five plaintiffs had been customers. They agreed to the automatic renewal process, which included that they would receive notice. They all received a notice, which they contend was deceptive. And they all received a charge as a result. So they all passed it. But they're all done. They're all done with their claims. Right. And I'm not asking you to justify their standing with respect to any damages claims. They have individually. I'm asking about their standing to assert a claim on behalf of a class for prospective relief when they are not people who have any current connection with synapse. Well, in fact, synapse is the leading purveyor of automatic subscriptions in the country. They do this through a number of methods, including airline miles, email, going to the store. The judge below probably found, we believe in this thing, that it was capable of repetition and that there was a potential for future harm. And in fact, the plaintiffs in this case have since been solicited by synapse for future claims. Is this solicitation issue? I mean, they have to actually be synapse customers in order to be concerned about automatic removal. And the only way they can be synapse customers is if they take the firm back to say, I want to be a synapse. I want to be a customer. Right. Unless and until they make a voluntary decision, they're at no risk at all, are they? I would disagree. And I think the court below would probably disagree with that, because what you're really saying is the issue with regard to them is moving, because they've already been synapse customers. They've been damaged. But we contend that they should not move, but they do have standing. We don't move this here because they— Well, I guess I'm not trying to quibble with you. I guess if you want to cast an removalist term, you can. But we're talking about prospective relief. We're talking about someday I'll be fooled into keeping a magazine subscription, and I shouldn't be—that shouldn't be allowed to happen. People who aren't subscribing to magazines, it would seem to me, are in a difficult position to say someday I'll be fooled into renewing a subscription. If they're not subscribers, how do they have standing to make a prospective claim for relief about a renewal? I think the Laffer case, which dealt with notice and with an issue, addressed it in saying that people who have—already have damage can bring the injunctive claim for class certification because they have standing, but they are already damaged, and therefore their claim is currently existing. Then the next question is can they seek injunctive relief? Well, then the question becomes whether there is the sufficient cohesiveness to seek the injunctive relief. But these people already have been customers. They've been injured. They have standing. There's no question about that. Great. I'm not answering about that. I'm talking about—I mean, we wouldn't be here if the case was about a handful of people's monetary damages, right? They have standing to do that, but it stretches credulity, doesn't it, to say that any one of these people would be suing for $90, I think was the highest—or $92. $30. Yeah. So what we're here talking about is the perspective, the injunctive relief going forward. And speak to the Los Angeles v. Lyons case, if you would, where the Supreme Court said, you know, you don't have standing because you might get arrested sometime in the future. That's just entirely speculative. How is that different than I might subscribe to a magazine? Indeed, isn't this an even more extreme case because the might is entirely within the control of the person who might do something as opposed to in the hands of a third party who might arrest? I think the standard that was used in this case was that there would be a reasonable possibility or potential for each member of the class, including the plaintiffs, being subjected to this unlawful practice again. And the only way they could be subjected to it is if they choose to subscribe, right? If they choose to subscribe to a magazine, don't forget, the offer is not—it doesn't have Synapse's name on it. It has a whole slew of different names that they use. So I go and I exercise my right to get a subscription to a magazine. And it has an automatic renewal. There's nothing to say that none of these people will never subscribe to a magazine again. And I think that stretches the credulity to say that they won't do that. So let's assume they do. The chances are that they're subscribing without knowing it to a Synapse product. Now, once they subscribe to a Synapse product, again, without knowing it, are they going to get a card in the mail that looks like junk and they're going to throw it out or not see it like most of the people here in the complaints that we have in our appendix? Or are these people, these same people who we have in this case, going to be subjected to the same practice? Because it's a continuing practice. It's a secondary practice. They have a right to get the magazine. Let me add this one point in before I lose the question I wanted to ask. Weren't there a number of suits brought by state attorney generals concerning the propriety of the notice? And weren't there some agreements nationwide that these notices are going to be uniform and that everyone will know whether or not this is from Synapse? Well, the answer is almost. And the reason is because the attorney general lawsuits were actually brought against Time magazine. And it was before it acquired Synapse. So what happened is 21 attorney generals sued Time magazine for the same practice and claimed that the lack of clear and conspicuous notice and the deceptive notice was a violation of consumer protection, the Consumer Fraud Act. And they entered into an assurance where Time magazine said they would give clear and conspicuous notice with, as Your Honor said, specific font sizes and prominence. Time went out and bought Synapse. And Synapse claimed that it was not subject to the assurance, but the assurance occurred to Synapse. I see. So your view is that Synapse can now go back to its ill ways and do whatever it wants with regard to notice, renewal notices. Yes. Time acquired Synapse so that it can then go and do the same thing through Synapse that it was barred from doing on its own. So we contend that the settlement does not bind Synapse. The settlement does not bind Synapse. So we, as consumers, are saying that while the same unconscionable requirement that bars Time magazine should be applied to Synapse, the only way we can do that is by an injunction because no consumer has the financial incentive to, as Your Honor pointed out, sue for $90, $30. The only way to do this is to say to Synapse, this is an unconscionable commercial practice under the state of New Jersey, which there's a case in this district that actually holds that. And you could, presumably, you could find current subscribers who could do that, right? But those current subscribers would always then be past subscribers because once they're current subscribers, then they have gotten the card and they've already canceled if they wanted to cancel. In other words, they weren't injured unless they'd been deceived, right? Is that true? Isn't, in fact, your theory of the case just the opposite of that? It's that I didn't want to renew, but I was tricked, and now I've renewed. And I won't sue them because I'm mad because they made me renew. Not because they quit, but because they renewed. I mean, we have to, those people, they got their money back. Synapse gave them their money back. It would not have the standing that the current people have because they don't have the injury under the Laffert case. In those cases, the actual named plaintiffs need to have the ascertainable loss in order to have the standing. Not the class members, but the actual plaintiffs. So these plaintiffs have that ascertainable loss. Let's talk here, if you would, for just a minute about going back to cohesiveness, I guess. Do you acknowledge that some of the class members were not fooled by the postcard? No, I know that that's an issue in the case. I thought Mr. McNair even said, you know, no, I was a fool. Well, he didn't say that. He said he almost threw the card out, but he still had the card. Let's take the situation in page 1005 of the appendix. We have his email to Synapse. If I can quickly just summarize that. He says he tried to cancel in May all the subscriptions. Then in June, he gets billed. And this is from the card. Then he calls in June and July, and he cancels some of them, but they still bill it. In July, he gets billed for $17.95. And maybe he's got complaints. Maybe he's got problems with them. But they're not the problem that you've identified in your complaint. The complaint is people are tricked. And he said, I almost threw it, but I didn't. I looked at it, and I took the steps to cancel. How is a person like that injured by the card? They find the card. They open the card. They act upon the card and do what they want to do. How is that person situated the same as a person who is fooled? I have two responses to that. The first is that by using that, that standard would be the most diligent consumer standard. In other words, we're going to say this card is not deceptive because the most diligent consumer, Mr. McNair, who is going to scrutinize every piece of mail, was not fooled. But what about the reasonable consumer? Hold on. You're answering a different question, though. I'm not asking whether this is a deceptive practice or not. I'm asking whether you've got cohesiveness in the class, which is if you've got a whole bunch of people in the class who aren't diligent consumers and they're not fooled, then what right do they have to be in the class? How can you certify a class with people who weren't fooled and people who were fooled? Well, in both BabyNeal and in recently in the Sullivan v. DeVee, the investment case, this court has held that an injury on the part of every single class member in an injunction class, a B2 class, is not required. I mean, in BabyNeal, the court said that, okay, the services that are provided for children were effective, but not every child needed the service. Not every child was injured by the service. Yet, as a class, as a whole, it was improper, the policy. I thought BabyNeal said that all the injuries weren't the same, but there was some negative impact on everybody in the class. No, it said that some children didn't even actually need the service. So that if they didn't need the services, they weren't even going to be injured. Could you talk about the idea that if the class is, in fact, certified, and you, in fact, proceed in a trial setting, that that decision is going to bind everyone who conceivably could, is now a subscriber, or will be a subscriber from bringing individual money damages? Right. And you are dealing with the other side of the cohesiveness test, which is that if you're going to bind everybody, what is the ramification on their individual rights and remedies? People who could not have died. Right. And the answer to that question is, in a case like this, where the damages are so small, with $30, $50, the individual incentive to pursue an individual case is almost non-existent. So what you have on one side is... Well, it's not existent. It is existent for people who's checking accounts who are out of balance because of the... But let's take it to the next logical step, Your Honor. We have a trial. The issue is, on common proof, is this a clear and conspicuous, there's a violation of the Consumer Fraud Act, is it an unconscionable practice? Let's say we win. Well, if we win, then obviously every consumer can then say, I've been injured, and go and individually claim. If we lose, which is where the problem is, obviously, then what do you have? Well, you have a notice that has been found, as to the class, to be clear and conspicuous, and not a violation. So nobody's been injured. They can try to claim the $30, or maybe they were injured because of the IVR system or something else, but they're not any worse off than they were the day before the trial. So there's much to gain, and very, very little, if anything, to lose on the part of the consumer who would benefit. Every consumer's going to benefit from clear and conspicuous notice. There's no consumer who can say, I don't want clear and conspicuous notice. So the benefit clearly outweighs the potential for the small-value consumer to, if we lose, to not have the right to pursue that small claim. The benefit is much greater to the class as a whole. Well, I have one final question for you before we go on to your adversary, and that has to do with how did you arrive at a $5 million diversity amount? I looked at the record and tried to figure out the 3% and 55,000 subscriptions. How did you arrive at that? Well, they had in their damages chart. You got that from Synapse's information? Yes. They gave us an interoperability of $43 million of new subscriptions. Their test cards showed that, even if they just added the words, this is your automatic renewal, which is the minimal amount you can. But the estimate is a loss of 55,000 subscriptions. Right. In the three relevant states. Right. And the District of Columbia. Yes. It would be like 3.1%. And we did an analysis. Now, what was the multiplier? 3.1% of what? 3.1% of, I believe, 43 million. But then I believe that we reduced it down to a percentage based on the three states. But Synapse, in its own retention strategy, says that if they lose one point, percentage point, and I can cite it to the appendix if you want, they lose, I think it was $2 million per percentage point. So it's a 3.1 percentage point. The benefit of the injunction is above $6 million right there. Okay. 3.1 times the percentage point being $2 million. Thank you. That would be page 10.5 of the record. Got it. Thank you, Mr. Gray. Thanks. Mr. Gilbertson. May it please the Court, Tom Gilbertson on behalf of the Pelley Synapse Group. Judge Ballard's exercise of discretion on this B-2 certification motion is unassailable in this case. First of all, we know that for just a variety of reasons, but the first reason, right out of the gate, is that this is a facially invalid request to certify a class that includes some people, not all, but some, actually quite a small percentage of people who have what the plaintiffs describe as unwanted charges, seeking monetary damages. They're not seeking monetary damages, but that's the only injury that they have suffered. That's an inappropriate class for B-2 treatment, and the issue is not whether the plaintiff's lawyers have included or requested damages in the complaint or taken it out of a complaint after they lose a B-3 class certification motion. The question that the rule is asking us is what is the appropriate relief? Are you abandoning the standing argument that you made in the district court? Absolutely not, Judge. Well, then let's start with standing because all the rest of that's meaningless, right, if they don't have a right to be here. Could you respond to the argument by Mr. Gariffin that the district court judge was correct in saying that all these people are at risk of being taken in again by the wiles of synapse? I believe the words that my colleague used were that the judge found there was a reasonable possibility of being subjected to the unlawful practice again. That falls far short of the standard that's articulated by this court and that's cited in our brief. The standard that these plaintiffs must show is a real and immediate threat of future injury, and they do not have that here. We might be fooled again. Falls far short of that. In the Chrysler financial case that we cited from the New Jersey district court, very similar situation, and the court found rightly that the fear of buying another Chrysler car at some point is too speculative to satisfy standing. Why wouldn't they be tricked again? I mean, you're not subject to the settlement with the state's attorney generals, and I understand that therefore you believe that you can change the notice, the renewal notice sent out to subscribers. So if you keep changing the notice that is characterized as deceptive, why couldn't the plaintiffs see it as junk mail again and be tricked into throwing it out and not responding? That's the same sort of reasonable possibility that's presented by the other cases and it doesn't rise to an immediate threat of future injury. But, Judge, another thing to keep in mind here is that these plaintiffs, they don't challenge the offer that synapse makes. We hear a lot about it in the case. It keeps coming up. It's about time again that they're challenging the initial offer that synapse makes to consumers for magazines. And that assurance of voluntary compliance that Time, Inc. entered with 23 state attorneys. Well, they're challenging the content and the appearance of the notice and the renewal notice that is sent out. The renewal notice, yes. Their claims are now limited to that and not the initial offer. So the initial offer is not alleged to be deceptive in any way by these plaintiffs. So that reduces even more any claims that they're at risk of being fooled in the future by something that they're not even challenging in the case for. I do want to make a point about that. Do you agree with Mr. Greifman that you are not subject to the settlement with Time magazine? I do agree with Mr. Greifman. Mr. Greifman agrees that synapse is not subject to the settlement. That was simply the terms that were arranged with the state's attorney generals. The state's attorney generals, they knew that Time was acquiring synapse. Why, if that's the case, is it preventing you from providing a deceptive postcard, a relief that benefits the entire class? We believe our notice complies with the assurance of voluntary compliance. That's a liability question. It can't be reached on class certification. Well, isn't that the end result of the injunction? Pardon me? Isn't that the end result of an injunction, which is precisely what the class is seeking? That ABC? I'm not sure if that's why the plaintiffs raised the ABC. They raised it as a benchmark against which to compare our notice to show that it's unlawful. In addition to the ABC, they raised the Magazine Publishers Association guidelines and a number of other things. Assume for the sake of discussion that the practice, the current practice, is problematic. If the point of the class certification decision is that there's a deceptive practice going on and your argument is the class is not cohesive, how do you respond to the plaintiff's argument that everyone benefits from a clear and non-deceptive renewal notification? Your Honor, everyone would always benefit from a better notice. We can take it to the level where individuals are hired to canvass customers and knock on their doors with a notice. The question is whether the existing notice violates the law and there's a pervasive or systematic failure of providing notice. So are you saying there's no way to make a class certification decision without making a determination on the merits? Yes, Your Honor. My concern on that particular question is on this D2 class cert motion. Is there a systematic failure? Is there a pervasive failure? That is one of those fact issues that a district court needs to decide to determine whether there's a class, whether there's a group injury, whether there's cohesion, whether the notice violates a given standard. Okay, and Judge Linares looked at this and said, yeah, I think there's enough here. I mean, he looked at it and said, yeah, I'm sorry, I don't think there's enough here. When he looks at it, he says there's not sufficient cohesion. What would a cohesive, I mean, is there any way we could put together a cohesive class? Or is this just one of those problems that's out there floating with no remedy? No, Your Honor, this is a misapplication of D2. So this is a group that claims to have unwanted charges, monetarily damaged. Congress has obligated a rule under the class action device for classes like that. It's 23B3. They tried that and it failed. Well, that didn't work. If B3 doesn't work and B2 doesn't work, so you have to understand why 23B3 did not work, Judge. Well, but the point is, and I think Judge Jordan's point is that there's a problem without a remedy. A serious problem without any remedy at all. If the record showed that it was a serious problem, it would be much closer to a record that would support group injury. So what the record showed here is aggregate data that showed that 70% of all folks who call the IVR to cancel do so. The named plaintiffs were all over the map with what happened to them. Many of them have no injuries whatsoever. Mr. McNair, we were just talking about when my colleague was up. He got the notice, recognized it, read it, understood it, acted upon it, had all the information he needed, had all the information that the magazine, the Publishers Association and the ABC would require of it. He opened it up and read it. He called the IVR and he canceled three out of four. The evidence is also that the notice is designed. The design of the notice itself is when you get it, toss it out. This is irrelevant. This has nothing to do with my magazine subscription. The argument is that there's an intent issue here that Synapse has designed the notice to look bad. If you look at page 11 of their brief runner, they compare it to some testing that the company did in the ordinary courts. They select a notice that was tested that they claim complies with the ABC. This is page 11 of their brief. They say when compared to a notice that complies with the insurance of voluntary compliance, the time entered, we find an increase in cancellations of about 3%. But why are we... I guess at the class certification stage, Mr. Gilbertson, from the plaintiff's perspective, it doesn't... have some right to present a claim for relief about allegedly deceptive practices without proving the ultimate merits to get certified. They've got an expert who comes in and says, yes, these are designed to deceive. You can look at these metrics and that's what tells you that. They've got some people who are prepared to walk into court and say, it said moving on it, I'm not moving, so I threw it away. How was I to know that inside it was really going to talk about something that had nothing to do with me moving? And they've got a bunch of people who are frustrated getting nickel and dimed by Synapse  Is there nothing in the class action mechanism that allows people in that position to band together for the purpose of getting relief, even if the relief is simply stop doing it, without the defendant coming in and saying, well, they can't prove it in the end anyway, so don't let them even get started. Not exactly what I'm here to judge. I think the answer to your question at some level is it's more than a pleading standard. So it's true, as your Honor suggests, that if they just want to come in and allege a pattern of practice, the law is going to require more from them when that class certification motion is filed. They're going to need to show the judge that there's a pattern of practice, and they need to prove that by a preponderance of the evidence, or under a P2 class, that there is a pervasive or systematic failure of notice. That's just the beginning, Judge. Your position is there's no cohesive class that can be constructed out of the universe of people in New Jersey, New York, and the District of Columbia with a claim for prospective relief. And the reason there is no such class is because they lose in the end. No, Your Honor, but I think it's true in this case. In a lot of consumer cases where the only injury alleged is monetary, P2 class certification is going to be a tough road to hoe for those folks. And it's not made for them. One reason is all the class claims for monetary damages got thrown under the bus to enable this attempt. Those claims are waived for the class. Isn't the idea that the claim for damages is so small and, in fact, very petty, argue in favor of class certification? That is a factor that's often cited in favor of a P3 predominance class, which is the only place claims like this belong. But, yes, that's frequently cited as a superiority factor, the aggregating of a lot of small damage claims. A class action device often serves an efficient purpose when we're able to aggregate claims for small damages. That's not what's happening here. Claims for small damages are getting thrown under the bus. And that's why my colleague raises the issue in the first place. He says, forget about them. They're so small, nobody will miss them. All right. So what's the solution? Let the state attorney generals go after Synapse as they went after Time Magazine? Well, they are the dog not barking in the night, aren't they? I want to speak to that ABC because, you know, we would argue on the merits that everything we're doing meets with that ABC. And if you look at Judge Lenars' initial opinion denying P3 class certification, he goes through these various standards that the plaintiffs have raised in their complaint and the notices that we've provided. But there's no systematic breakdown when you take a notice that the plaintiff's claim would comply with the ABC compared to what we're now doing. But it's 2.8 or 3% more cancellations. That's the 3% confusion percentage. It doesn't even meet the threshold under the Lanham Act for confusion. So we don't have a systematic breakdown. We don't have a pervasive failure of notice. And all the record evidence supported the judgment. He said, you know, I don't see that here. If there's a pervasive breakdown, like there was in Baby Neal, it was stipulated in Baby Neal. Was everybody injured in Baby Neal, the whole class, or was that class, as your opposing colleague asserts, really just like this one in that not everybody had injury but there was going to be a benefit for everyone and therefore there was sufficient cohesion? The juveniles who were in the foster care program of the Philadelphia Department of Human Services, they weren't supposed to have money damages. This was a classic application of B-2 in Baby Neal. And we knew because the DHS stipulated that they could not provide the mandated services. What we know in that case that we don't know here is that if one of the class members needed an assessment from a social worker, if they needed a trained foster parent, they likely were not going to get it because DHS was unable to provide those things. Here we ask, well, if someone needs a notice about their renewal, will they get an effective notice? The evidence suggests that they will. And that a notice that these folks want will drive up cancellations by 0 to 0.8% thereabouts. Article situation. Mr. Gilbertson, thank you very much. Thank you, Your Honor. Mr. Gregman. Thank you, Your Honor. Five minutes. Thank you. With regard to the standing issues, I just wanted to get back to that quickly. In the lower court, Judge Linares looked at the price of cases. In the price of cases, you have high cost durable goods. Here you have a low cost coming at you from different directions. So he used the capable of repetition standard, which we had as the proper standard. When you say capable of repetition, how is that even an issue here? Because the standard is capable of repetition yet evading review. This doesn't evade review. You've got people who have individual claims. They have standing to make those individual claims. You're named plaintiffs. They're here. They can make the argument. How does it evade review? Doug. I believe that that votes in favor of standing. It votes in favor of standing for their individual claims but doesn't have anything to do with the class claim, does it? You can't make the pitch that this is capable of repetition yet evading review when you're here in court with uncontested standing as to your individual claims. Well, but these, again, in fact, in the record it appears that one of the plaintiffs, Mr. Austin, did actually get, like you said, fooled again and had another subscription that ended up being a synapse subscription. He's a good example of that. Again, I go back to the writing. I might have missed the answer to my question, so let me put it to you again. How can it be the case that capable of repetition yet evading review gets you to class standing here when it's uncontested that you have standing to press the point in individual capacity? But the individual capacity would only, well, as individuals, the question then becomes do they have a right to seek an injunctive relief on behalf of the class in which they have standing? I'm not sure how that connects up. The claim you're making is not, I mean, you're now turning your claim for relief into the underlying claim. You can't, I don't think, really fairly smoosh things together. The question is do you have a claim that is capable of repetition yet evading review, and the answer is absolutely not because you're here with uncontested standing to make the claim. Now, whether you also get to have relief of an injunctive sort on behalf of an entire class, that's a whole different matter, isn't it? Yes, and the Consumer Fraud Act in New Jersey says that the consumer who has standing because of the asset changeable loss has standing to pursue the injunction claim as well. The statute gives you the injunction claim on it. An individual can pursue the injunction claim. But not on behalf of a whole class if your only basis for doing it is on the theory that it's capable of repetition yet evading review. I don't see how that gets you traction at all. In the Lacker case, I think that they found that because it was under the Consumer Fraud Act, you do have the remedy of the injunction relief on behalf of a class as an individual that if you have the asset changeable loss, you get in that way through the Consumer Fraud Act. I guess that's the answer. But if I could just quickly go into one other issue. We want to be clear that we contend the class is cohesive here because all members of the class are entitled to notice. They all get a defective card, and they all seek to repair that issue to get a clear and conspicuous notice that we claim we're legally entitled to. We think we can demonstrate that, but the negative option rule under the FTC regulations requires clear and conspicuous notice in a negative option plan. That's the language you use. The FTC section 5 requires, it doesn't say clear and conspicuous notice, but it says any act which is unfair practice towards consumers is illegal. Their own document says the regulatory climate has evolved to the point where we are legally required to send notifications to a majority of our customers in advance of a billing event, at page 1029. And they say our overall retention strategy seeks to maximize lifetime customer value through lowering cancellation rates. So they're quite aware of the fact that their intention and business model is to lower cancellation rates. Is there something nefarious in there? Not unless they know that they're doing it by providing a deceptive card. A whole different question, right? Yes, and if you go to page 1062 of the record, here's their analysis of the card, and I'll quote, Many customers felt that they were being slammed, not receiving a chance to say no to renewals before they hit the account. Quote, many customers, many, either didn't receive and didn't notice it was for our max. Quote, quote, quote, quote, quote, quote, quote, quote, quote, quote, quote, quote, quote, quote, quote, quote, quote, quote, quote, quote, quote. Quote, very generic black and white mail. Quote, quote, page 1062. They know what they're doing. No question. It's a very sophisticated company. Mr. Griden, thank you very much. And Mr. Gilbertson, thank you very much. We'll take the case under advisement.